UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x

RICHARD MASSIE,                        :

                    Plaintiff,         :     REPORT & RECOMMENDATION

          -against-                    :     06 Civ. 12905 (JSR)(MHD)

METROPOLITAN MUSEUM OF ART,            :

                    Defendant.         :
----------------------------------x

**TO THE HONORABLE JED S. RAKOFF, U.S.D.J.:**


_____ Plaintiff Richard Massie, appearing pro se, commenced this Title VII lawsuit against his employer, the Metropolitan Museum of Art ("the Museum"), alleging race discrimination and retaliation in connection with several employment actions by the Museum. Defendant filed a motion to dismiss that was granted in part, leaving in place only plaintiff's claim premised on his dismissal from the Museum and his subsequent re-hiring after a brief unpaid suspension in April 2006. Defendant now seeks summary judgment dismissing that claim as well. For the reasons that follow, we recommend that defendant's motion be granted.

BACKGROUND

A.   Plaintiff's Claims Against the Museum

Plaintiff's complaint consists of the standard form provided by the court to pro se litigants seeking to sue their employers for discriminatory conduct. In addition to filling out portions of the form, plaintiff appended twenty-four pages of handwritten notes and other documents, in an attempt to explain the factual basis for his lawsuit.

In the pre-printed portion of the complaint, plaintiff specified Title VII as the legal basis for his suit, and identified the following categories of discriminatory conduct of which he accuses the Museum: "termination", "unequal terms and conditions" of employment, "retaliation" and "[o]ther acts", which he failed to specify. (Compl. at 1, 3). He further stated that the discrimination was based on his race ("African American") and color ("black"). He also reported that he had filed charges with the New York State Division of Human Rights ("SDHR") in June 2004, February 2006 and April 2006, and that he had filed a charge with the Equal Employment Opportunity Commission ("EEOC") on October 7, 2006. (Id. at 4).

Plaintiff's complaint must be read liberally in view of his status as an untutored pro se litigant and may not be held to a rigorous standard of descriptive precision, e.g., McEachin v. McGuinnis, 357 F.3d 197, 200-01 (2d Cir. 2004), but the pages of handwritten notes appended to his form complaint and the documents annexed to his pleading are difficult both to decipher and to understand. It appears that plaintiff, who has been employed as a security guard at the Museum, was complaining about mistreatment by fellow workers and supervisors at the Museum over the years, starting as early as 2001. He mentions some disciplinary actions that had been taken against him, which we infer he views as unjustified, and refers as well to conversations that he has overheard in which co-workers or supervisors have either mocked or criticized him for perceived eccentricities or disclosed the fact that he has undergone psychiatric examination and medical treatment. Plaintiff also makes reference to his having been terminated for being away from his post at some time in 2006. As for why any of the actions that he refers to were in violation of Title VII, plaintiff does not say specifically, but we infer, based on the form portion of the complaint, that he is asserting that he was so treated because he is African American.

B.   <u>Defendant's Motion to Dismiss</u>

In 2007, the Museum moved to dismiss the complaint because, contrary to the requirement of Rule 8, the pleading did not contain "a short and plain statement" of plaintiff's claims, and instead rambled on at some length and somewhat incoherently about plaintiff's perceived travails at his workplace. Alternatively, the Museum sought to dismiss plaintiff's claims to the extent that they were premised on events apart from those described in plaintiff's April 10, 2006 SDHR complaint. The defendant based this request on the statute-of-limitations provision in Title VII. <u>See</u> 42 U.S.C. § 2000e-5(f)(1). Defendant claimed that the April 2006 agency complaint was the only one for which the EEOC had issued the required right-to-sue letter to plaintiff within ninety days of plaintiff having filed his lawsuit, and therefore only discriminatory acts that had taken place within three hundred days prior to the filing of that complaint and that were described by it were properly addressed in a Title VII action. <u>See</u> 42 U.S.C. § 2000e-5(e)(1).

In support of its motion, defendant proffered a series of three complaints that plaintiff had filed against it with the SDHR and EEOC since June 2004, as well as the disposition of those

charges both by the SDHR and by the EEOC. (Aff. of Allan S. Bloom, Esq. in Supp. of Def.'s Mot. to Dismiss the Compl., executed Feb. 15, 2007 ("Bloom Aff. 1"), Exs. B, C, H, I, J, M, O & P). These charges provide a far clearer statement of plaintiff's grievances and the circumstances that may have given rise to them.

In plaintiff's June 30, 2004 dual SDHR and EEOC charge, he complained of events spanning the period from September 2001 to June 2004, and asserted that they reflected racial and disability discrimination against him by the Museum. (Id., Ex. B). He stated that in September 2001 the Museum had forced him to undergo psychological testing and required him to take an involuntary unpaid medical leave beginning on October 27, 2001. His unpaid leave lasted until March 12, 2002, and he complained that he had been labeled "a security threat and security risk". He also alleged that, on his return, a Museum manager of Hispanic origin named Rivero and a supervisor named Sheila Wallace, of African-American descent, had referred to him as "crazy". (Id., Ex. B at ¶ 3).

The agency complaint went on to state that Rivero and the Museum's Associate Security Manager, Steven Mandela, had terminated plaintiff's employment on May 23, 2003 because he had "not renewed [his] state license," but that after he had filed a grievance, the

5

Museum reinstated him on November 21, 2003. (<u>Id.</u>, Ex. B at ¶ 4). Plaintiff also alleged that on January 24, 2004 Rivero had told another employee that he liked to annoy plaintiff, and that plaintiff was undergoing a variety of medical tests and treatment. (<u>Id.</u>, Ex. B at ¶ 5).

In response to this charge, the SDHR issued a determination on December 29, 2004 that there was no probable cause to believe that the Museum had engaged in the complained-of discriminatory acts. (<u>Id.</u>, Ex. C). It found that plaintiff's medical leave had been requested by his own union and that he had been reinstated when the leave ended. It further found that plaintiff had been terminated because his state license, which permitted him to work as a security guard, had expired, and because of his poor work performance. It also observed that plaintiff had later been reinstated based on the recommendation of the Museum's internal grievance committee, subject to a six-month suspension in light of the fact that he had allowed his license to lapse and had worked ten months without a valid license despite a prior warning about allowing his license to expire. (<u>Id.</u>, Ex. C at 1).

The SDHR also found that, in the wake of comments by plaintiff's manager, Mr. Rivero, about plaintiff's medical

condition, a Senior Manager at the Museum had instructed Rivero to refrain from any such comments in the future. The SDHR further noted that plaintiff had admitted that since that warning, on June 6, 2004, he was not aware of Rivero having made any statements about him. (Id., Ex. C at 1-2). Finally, the SDHR took note that approximately twenty-five percent of the security guards at the Museum were Black, and that plaintiff continued to be employed by the Museum after his reinstatement. (Id., Ex. C at 2).

Plaintiff filed a second dual complaint with the SDHR and EEOC on February 15, 2006. (Id., Ex. H). In this charge he alleged that Rivero, whom he described as the Museum's manager of security, had mentioned his medical condition to another security guard in February 2005. Plaintiff also referred to an alleged conversation (in which he did not participate) in which Rivero had disclosed plaintiff's "medical diagnoses" to Wallace and had also told her that plaintiff was having trouble with her and with the "Supervisor of Security", named Ortega. (Id., Ex. H at ¶ 2).

In his complaint plaintiff also alleged that Rivero had told Steven Mandela, whom he also described as the Museum's Manager of Security, in March 2005 that Ortega was "trying to get back at Massie." Plaintiff further claimed that in May 2005 Ortega had told

7

another security guard that he had talked to Wallace about plaintiff's medical diagnoses and said that he was going to try to get plaintiff "sick or fired". (Id., Ex. H at ¶¶ 3-4).

The balance of plaintiff's second SDHR complaint referred principally to other statements allegedly made by Ortega about him. Plaintiff asserted (1) that Ortega had said to another guard in June 2005 that plaintiff took medications, (2) that in July 2005 Ortega had said to himself that he wanted to have someone "'F—' [plaintiff] up,"[1] (3) that in August 2005 Ortega had told several other Museum employees that he wanted to harm plaintiff, assertedly because plaintiff had filed a prior agency complaint, and (4) that in September 2005 he had told another guard that plaintiff "was 'a gay basher'". (Id., Ex. H at ¶¶ 5-8). Finally, plaintiff alleged that in January 2006 he had heard Rivero laughing "that Mr. Ortega was trying to get back at me through customers of the Museum." (Id., Ex. H at ¶ 9).

On March 17, 2006 the SDHR dismissed the complaint for lack of jurisdiction based on plaintiff having filed a lawsuit against the Museum in state court prior to his filing of the SDHR complaint. As

---

[1] Plaintiff claimed that he had overheard Ortega making this statement to himself in the locker room. (Id., Ex. H at ¶ 6.)

noted by the SDHR, that court filing amounted to an election of remedies and divested the agency of jurisdiction over plaintiff's complaint. (Id., Ex. I).[2]

From defendant's submissions, it appears that the EEOC also dismissed these charges based on its notice to the parties dated May 2, 2006. That notice stated that the EEOC lacked jurisdiction over plaintiff's claims because he had already filed suit in state court. (Id., Ex. J). It also specified that if plaintiff wished to pursue the matter he would have to file suit within ninety days after receipt of the notice. (Id.).

Finally, plaintiff filed a third complaint with the SDHR and the EEOC on April 10, 2006. (Id., Ex. M). He alleged that on April 5, 2006 he had attended a hearing at which a Museum manager and a union representative were also present. According to plaintiff, the

---

[2] Defendant included as an exhibit in support of its dismissal motion a copy of a complaint that plaintiff filed in New York State Supreme Court on December 2, 2005, which contained allegations that appear largely to parallel the charges found in his February 15, 2006 agency complaint. (Id., Ex. F).

Defendant also proffered a Notice of Claim and Summons, dated March 21, 2006, which plaintiff filed in the Small Claims part of Civil Court in the Bronx, also against the Museum. The form, however, does not legibly indicate the nature of plaintiff's grievance in that case. (Id., Ex. G).

manager left the hearing to speak to Rivero, the security manager who had been a subject of plaintiff's two previous agency complaints, and then returned to the hearing and fired him. Plaintiff asserted that the manager had taken this action at Rivero's direction, to retaliate against plaintiff for filing his February 15, 2006 SDHR complaint. (Id., Ex. M at ¶¶ 1-2).

On May 25, 2006, the SDHR issued a determination finding no probable cause to believe that the Museum had discriminated against plaintiff. In so concluding, the SDHR noted that plaintiff had been terminated for leaving his post without notifying either his supervisor or the Museum's command center, after having previously been disciplined for unexcused absences, including having been placed on probation and suspended for poor performance. (Id., Ex. O at 1). The SDHR also found that, in the wake of plaintiff's termination, he had filed a grievance to challenge his dismissal and that a hearing was held to address the grievance on April 11, 2006. At that time, the Museum had agreed to reinstate him based on his admission that he had left his post without notice and his request that he be given another chance. (Id.). Finally, the agency decision noted that the Museum had decided to reinstate plaintiff on April 11, 2006, before it had received notice of plaintiff's complaint to the SDHR, which had been sent to the Museum by

regular, first-class mail that same day. (<u>Id.</u> at 1-2).[3]

On July 24, 2006 the EEOC issued a notice to plaintiff that it was adopting the findings of the SDHR and advised him of his right to sue. The notice stated that under Title VII his suit must be filed within ninety days of his receipt of the notice. (<u>Id.</u>, Ex. P).

In response to defendant's dismissal motion, we recommended that plaintiff's complaint not be dismissed entirely under Rule 8, but rather that it be interpreted to encompass the allegations in plaintiff's three complaints to the SDHR and EEOC. (Report and Recommendation dated Sept. 17, 2007, 13-14). However, we recommended that any of plaintiff's claims based on the allegations that he raised in his first two agency complaints be dismissed as untimely, due to his failure to file suit within ninety days of receiving an EEOC right-to-sue notice pertaining to those allegations. (<u>Id.</u> at 15-16). We therefore recommended that defendant's motion to dismiss be granted to the extent of dismissing all claims other than those surrounding plaintiff's

_____

[3] It appears that the Museum's Human Resources department received a copy of the complaint on April 26, 2006. (<u>Id.</u>, Ex. N).

April 2006 termination and reinstatement. (Id. at 17). The District Court adopted our recommendation to dismiss all but plaintiff's claim for lost pay and other relief based on his discharge and reinstatement by defendant in April 2006. (Order dated Dec. 5, 2007).[4]

C.   The Settlement Events

On September 5, 2008, the parties convened on the ninth floor of the Courthouse for plaintiff's deposition. (Aff. of Allan S. Bloom, Esq. in Supp. of Def.'s Application to Enforce the Settlement, executed Oct. 17, 2008 ("Bloom Aff. 2"), ¶ 1). During that deposition, plaintiff testified that he had lost only ten days of pay and the opportunity to work overtime -- which he estimated as a loss of three hours -- as a result of his April 2006 discharge and reinstatement subject to a suspension. (See id., Ex. A at 102, 111). During a break from the deposition, the Museum's counsel offered, on behalf of his client, to pay plaintiff the entire amount of the lost pay that he claimed to have suffered as a result

---

[4] The District Court noted that although plaintiff's complaint had been filed slightly outside the ninety-day window for filing suit, plaintiff had submitted his complaint to the Pro Se Office of the Court within the required time-frame, and therefore equitable tolling of the statute-of-limitations was warranted. (Id. at 2).

of the termination and reinstatement -- ten days of straight-time pay plus three hours of overtime pay -- calculated at plaintiff's April 2006 rate of pay. (<u>Id.</u> at ¶ 4). Plaintiff agreed, and stated that he consented to those settlement terms on the record during a brief conference that I convened with the parties that afternoon. (<u>Id.</u> at ¶ 4 & Ex. B).

Several days later, plaintiff sent correspondence to the court indicating that he wanted to "seek reconsideration" of the agreement. (<u>See</u> Letter to the Court from Richard Massie, dated Sept. 8, 2008). In a subsequent letter, he indicated that he did not want to settle the case, but instead wanted to "fight for [his] rights" and apologized for having made a "regrettable agreement." (<u>See</u> Letter to the Court from Richard Massie, dated Sept. 12, 2008). Although defendant moved to enforce the settlement agreement, we recommended, based on plaintiff's untutored <u>pro</u> <u>se</u> status[5] and questionable mental state, that the agreement not be enforced, and that recommendation was adopted on August 28, 2009. (Report and Recommendation dated July 22, 2009; Order dated Aug. 28, 2009).

---

[5] Plaintiff filed this suit <u>pro</u> <u>se</u> but obtained an attorney to represent him in opposing defendant's motion to enforce the settlement. That attorney later withdrew, and Mr. Massie is once again appearing as a <u>pro</u> <u>se</u> litigant.

13

D.   <u>The Current Motion</u>

Following the completion of discovery, defendant has moved for summary judgment on plaintiff's remaining claim, for retaliation based on his termination and rehiring subject to a brief suspension in April 2006. Defendant contends that plaintiff cannot establish a <u>prima</u> <u>facie</u> case of retaliation because he has not adduced sufficient evidence to establish a causal connection between prior protected activity and his termination. Moreover, defendant argues that even if plaintiff could establish a <u>prima</u> <u>facie</u> case of retaliation, there was a nondiscriminatory reason for his termination -- the fact that plaintiff left his post in violation of the Museum's security regulations -- that he cannot demonstrate to be pretextual. (Def.'s Mem. of Law in Supp. of its Mot. for Summ. J. ("Def.'s Summ. J. Mem."), 6-8).

In support of its motion, defendant has submitted a series of documents, consisting of excerpts from plaintiff's September 5, 2008 and December 4, 2009 depositions, the Museum's security regulations, official correspondence between security officials at the Museum and plaintiff concerning his discharge and reinstatement, the grievance form that plaintiff submitted following his termination, and the collective bargaining agreement

14

between the Museum and Local Union 1503 of District Council 37, a
union to which plaintiff belongs. (<u>See</u> Aff. of Allan S. Bloom, Esq.
in Supp. of Def.'s Mot. for Summ. J., executed Jan. 21, 2010
("Bloom Aff. 3"), Exs. A-F).

    On February 2, 2010, plaintiff filed his opposition to
defendant's motion. Although we must interpret this submission
liberally in deference to plaintiff's status as an untutored <u>pro se</u>
litigant, it is difficult to ascertain its meaning. First,
plaintiff rambles on at length about his adverse experience working
with, and alleged mistreatment by, security managers at the Museum,
describing various incidents dating back to 1996. (Pl.'s Mot. in
Opp'n to Mot. for Summ. J. ("Pl.'s Opp'n"), 2-5). Under our most
generous reading, plaintiff advances these personal accounts to
demonstrate a history of discrimination against him. Next,
plaintiff describes, under the headings of "The Concept of
Abandoning Post", "The Story" and "Reviewing the Facts", his
version of the events that led to his April 2006 termination and
that provide justifications for leaving his post. (<u>Id.</u> at 6-9). He
also includes a description of audio material recorded on a
microcassette tape that he submitted with his opposition papers,
which allegedly contains an affidavit from his supervisor George

15

Weiss[6], as well as copies of personal emails that he wrote to defense counsel. (Pl.'s Opp'n at 8, 10-17).

Defendant filed a reply submission on February 24, 2010, arguing that plaintiff has not adduced specific, admissible evidence to defeat summary judgment. (Def.'s Reply Mem. of Law in Supp. of its Mot. for Summ. J. ("Def.'s Summ. J. Reply"), 2). More specifically, defendant contends that plaintiff presented "irrelevant anecdotes, speculation, hearsay, and unsupported conspiracy theories" to buttress his retaliation claim, and that his after-the-fact explanations for why he abandoned his post do not demonstrate that the Museum's reliance on his absence from his assigned station in terminating his employment was pretextual. (Id. at 2-4). Defendant also contends that to the extent that plaintiff proffered what he believed to be depositions and affidavits, they are inadmissible because plaintiff took no depositions and did not submit any sworn affidavits. (Id. at 3-5). Defendant also submitted a declaration from John Packert, the Assistant Security Manager at the Museum, who stated that he had terminated plaintiff's

---

[6] The name "Weiss" appears to be incorrectly spelled in plaintiff's submission. The Museum's correspondence with plaintiff concerning the April 2006 incident references a Senior Supervising Security Officer George "Wyche." (See Bloom Aff. 3, Ex. C).

employment on April 5, 2006 based on plaintiff's admitted
abandonment of his post earlier that day as well as his prior
disciplinary history. (Decl. of John Packert in Supp. of Def.'s
Mot. for Summ. J., executed Feb. 19, 2010, ¶¶ 1-2). He indicated
that he had met with plaintiff to inform him of his termination on
April 5 and that he sent him a memorandum to memorialize that
meeting, which he submitted as an exhibit to his declaration. (Id.
at ¶¶ 2-3 & Ex. A).


    Without leave from the court to file a sur-reply, plaintiff
has proceeded to submit a series of handwritten letters, in further
support of his opposition to defendant's summary-judgment motion,
all of which are incoherent and difficult to decipher. On February
26, 2010, plaintiff provided a six-page handwritten submission to
the court misleadingly titled "reply memorandum of Law in support
of it's Motion of Summary judgment [sic]", which purported to have
been submitted on behalf of the Museum. (See Letter to the Court
from Richard Massie, dated Feb. 26, 2010). Defendant promptly
clarified that it was not involved in the preparation of
plaintiff's letter despite its title and requested that the
submission be disregarded as inappropriate and untimely. (See
Letter to the Court from Emily J. Ratté, Esq., dated Mar. 3, 2010).
Plaintiff then submitted a response to defendant's letter,

17

insisting that his letter was timely. (See Letter to the Court from Richard Massie, dated Mar. 5, 2010). In addition, on April 13, 2010, the court received an "Addendum" from plaintiff, which, as far as we can gather, requests an order of protection and advance payment of damages and serves as a further sur-reply to the pending summary-judgment motion. (See Letter to the Court from Richard Massie, dated Apr. 12, 2010). Defendant responded to plaintiff's submission and again requested that it be disregarded as inappropriate, arguing that the court had not granted plaintiff leave to file any sur-reply or addendum to his papers. (See Letter to the Court from Emily J. Ratté, Esq., dated Apr. 16, 2010). Similarly, the court received from plaintiff a further addendum to his summary-judgment opposition dated July 16, 2010. (See Letter to the Court from Richard Massie, dated July 16, 2010). This correspondence does not stand apart in substance from his previous submissions, except for an offhanded mention of $100 million, which we interpret to be plaintiff's latest demand for damages from defendant. (Id. at p. 4).

Most recently, plaintiff submitted two letters purporting to detail additional incidents of retaliation against him, including, as far as we can gather, his recent termination from his position at the Museum following two disciplinary hearings. (Letter to the

Court from Richard Massie dated July 29, 2010; Letter to the Court from Richard Massie dated Aug. 16, 2010). The July 29 letter attaches a July 22, 2010 memorandum that was apparently sent to plaintiff to memorialize a disciplinary hearing that had been held earlier that day with Security Manager Rivero, an assistant security manager for the Museum, plaintiff and plaintiff's union representative. (July 29 letter from Massie, first attachment). The meeting addressed a complaint that had been filed about plaintiff's use of abusive language to a Museum guest on June 20, 2010. (<u>Id.</u>). According to the memo, plaintiff had admitted using the improper language, but indicated that he had been provoked into doing so. (<u>Id.</u>). The memo stated that it functioned as a reminder that such unprofessional behavior could be cause for termination as well as a written warning that any additional infractions would result in more serious discipline. (<u>Id.</u>). Plaintiff's July 29 letter also attached an incident report that had been filed about the June 20 incident by a Museum security supervisor. (<u>Id.</u>, second attachment). Plaintiff's letters indicate that he was fired by the Museum on July 28, 2010. (<u>Id.</u>; Aug. 16, 2010 Letter from Massie at 2).[7]

---

[7] We have also received a letter from plaintiff dated August 6, 2010, annexing a copy of a submission that he apparently made that day to the EEOC and the SDHR regarding his recent termination. As best we can decipher, he is asking that his administrative complaint about his recent termination be handled by the EEOC.

E.   <u>Note About the Record</u>

Since defendant seeks summary judgment, we first summarize the evidentiary record, which in this case is somewhat opaque, due in large part to the incomprehensibility of many of plaintiff's submissions, which may be partially attributable to his <u>pro se</u> status. In any event, the record before us consists primarily of correspondence between and among the parties and this court, various exhibits that defendant has proffered over the course of this lawsuit, and defendant's deposition of plaintiff, which began on September 5, 2008 and was concluded on December 4, 2009. We recognize plaintiff's status as an untutored <u>pro se</u> litigant and correspondingly construe his numerous submissions subsequent to defendant's notice of motion for summary judgment as part of his opposition filing. We understand that defendant requests that plaintiff's submissions beyond his initial opposition be stricken as untimely and inappropriate, but, as discussed below, plaintiff's supplementary submissions do not contain any admissible evidence, and thus our acceptance of those documents will not prejudice defendant on its motion.

In recounting the factual underpinnings of plaintiff's retaliation claim, we rely on the exhibits submitted in support of

20

defendant's motion to dismiss (see Bloom Aff. 1), the exhibits submitted in support of defendant's motion to enforce the settlement agreement (see Bloom Aff. 2), the documents accompanying defendant's summary-judgment motion, including excerpts from the transcripts of the defendant's deposition of plaintiff in September 2008 and December 2009 (see Bloom Aff. 3), and the declaration of John Packert that defendant submitted as part of its reply papers.

We note that plaintiff sought no discovery from defendant and that plaintiff's submissions proffer no admissible evidence for the purposes of this summary-judgment motion. Plaintiff appended an "affidavit" to his opposition to the current motion in the form of a microcassette recording, which includes few audible statements that could be construed in any fashion as an affidavit. The recording consists of background noise and intermittent utterances that lack context and meaning. At certain moments, we can discern two interlocutors, who at times utter relevant terms such as "deposition" and "termination," but the speakers are not identified, and, more importantly, there is no indication that the taped conversation -- even if we could understand it -- is a competent evidentiary submission. Plaintiff also appended personal emails addressed to defense counsel that contain incoherent sentences and nothing resembling admissible evidence.

21

Aside from the alleged "affidavit" and personal emails, the remainder of plaintiff's opposition submissions consist of personal testimony that is unintelligible and incomprehensible. In the few instances where we can extract some meaning from his copious submissions, those assertions are unsupported by any evidence in the record, and are largely uninformative for the purpose of this motion. Given the utter lack of cognizable evidence presented by plaintiff, we are hard-pressed to find any dispute regarding defendant's statement of facts pertaining to the retaliation claim here.

F. <u>Facts Pertinent to Plaintiff's Retaliation Claim</u>

Plaintiff has worked as a Security Officer at the Metropolitan Museum of Art since July 12, 1995. (Bloom Aff. 3, Ex. A at 24, 29).[8] He received a Bachelor of Arts degree in Art and Advertising from the City College of New York, and prior to working at the Museum had acquired some modest employment experience. (Bloom Aff. 3, Ex. A at 24, 25; Bloom Aff. 2, Ex. C).

---

[8] It appears from plaintiff's most recent submission to the court that he was terminated from this position on July 28, 2010. (July 29, 2010 Letter from Massie).

According to the security regulations of the Museum, plaintiff was "responsible for the overall protection of the people and objects within the Museum complex." (Bloom Aff. 3, Ex. B at 5. See also Bloom Aff. 3, Ex. A at 29-30). His duties included protecting artwork from theft or damage and protecting visitors from unsafe conditions. (Bloom Aff. 3, Ex. A at 30-31). Plaintiff reported that as a security officer he would "make sure the light is on, that the visitors are kind of like comfortable while they're there" and "keep the people away from [the artwork and] . . . limit them with their flash cameras." (Id., Ex. A at 30).

The security regulations of the Museum require that "[a] post shall never be left unattended." (Id., Ex. B at 5). If a security guard needs an "unscheduled break," also referred to as a "personal", he is to contact his Section Supervisor or, as a last resort, the Supervisor via the Command Center. (Id.). Plaintiff admitted during his deposition that on April 5, 2006, he left his post and that he did not have permission to do so from his Section Supervisor or the Command Center. (Id., Ex. A at 38, 79, 85). At approximately 2:00 P.M. on that day, Senior Supervising Security Officer George Wyche reported to the Command Center that plaintiff had abandoned his post in the Linsky Galleries. (Id., Ex. A at 84-85; Packert Decl. at ¶ 2). Officer Wyche subsequently found

23

plaintiff in the Museum's Human Resources Office. (Id., Ex. A at 84-85, Ex. C).

Plaintiff explained that he had left his post for less than ten minutes and that after he returned, his chief asked him to report to a meeting at 3:15 P.M.. (Id., Ex. A at 73). This meeting was attended by plaintiff's union representative and Assistant Security Manager John Packert. (Id., Ex. A at 73, Ex. C; Packert Decl. at ¶ 2). Packert stated that during this meeting he terminated plaintiff's employment based on his admission that he had abandoned his post as well as plaintiff's prior disciplinary history. (Packert Decl. at ¶ 2). Packert confirmed plaintiff's termination in a letter to him later that day, citing the fact that "[t]raining sessions, written warnings, probationary periods and suspensions -- including a recent suspension on March 5, 2006 -- have not proven effective in correcting [Mr. Massie's] job performance." (Bloom Aff. 3, Ex. C).[9]

---

[9] The record does not include plaintiff's full disciplinary history as a security guard at the Museum. However, plaintiff's past SDHR and EEOC proceedings provide pieces of his disciplinary history and corroborate Packert's statement that plaintiff did receive prior disciplinary sanctions. Plaintiff's work history with the Museum includes: an involuntary medical leave for psychological testing in September 2001, which had been suggested by his union representative (Bloom Aff. 1, Ex. B at ¶ 3), a six-month suspension in 2003 because of an unrenewed state license that is required by the Museum (id., Ex. B at ¶ 4), and unexcused

Following his termination, plaintiff filed a grievance with the Museum and was given a hearing on April 11, 2006. (Bloom Aff. 3, Ex. A at 107-08, Ex. D). His union representative, Sean Turner, Assistant Security Manager Mario Piccolino, and Chief Security Officer John Barelli attended the hearing. (<u>Id.</u>, Ex. A at 108, Ex. E). During the meeting, Officer Barelli decided to reinstate plaintiff and to give him a "second chance." (<u>Id.</u>, Ex. E). Plaintiff's disciplinary sanction was thus reduced to a ten-day suspension without pay. (<u>Id.</u>).

On April 10, 2006, the day before his grievance hearing, plaintiff filed a complaint with the SDHR. (Bloom Aff. 1, Ex. M). He alleged that during his disciplinary hearing on April 5, 2006, Mr. Packert had left the room to speak to Rivero, the supervisor mentioned in plaintiff's prior SDHR complaints, and had then returned to the hearing and fired him. Plaintiff asserted that Packert had taken this action at Rivero's direction, to retaliate against plaintiff for his having filed a complaint with the SDHR on February 15, 2006. (<u>Id.</u>, Ex. M at ¶¶ 1-2).[10] The substance of plaintiff's April 10, 2006 SDHR complaint forms the basis of the

absences and placement on probation. (<u>Id.</u>, Ex. O).

[10] For the details of plaintiff's February 15, 2006 SDHR complaint, <u>see</u> pp. 7-8, <u>supra</u>.

one remaining claim in this lawsuit.

During his deposition, plaintiff claimed that it was a
"management decision" to fire him and stated that he suspected that
Rivero had made the decision to retaliate against him for having
filed a complaint against the Museum with the SDHR at the end of
2005, although he admitted that he did not know for sure who had
made the decision to terminate his employment. (Bloom Aff. 3, Ex.
A at 37-38, 203, 260). Plaintiff stated that Rivero had fired him
in order to gain leverage "against an answer that he had to give to
the State Commission on Human Rights." (Id., Ex. A at 246).
Plaintiff claimed that he had subsequently overheard Rivero
admitting that he was responsible for plaintiff's termination.
(Id.). However, plaintiff conceded that he did not believe that
Rivero knew about the complaint that plaintiff had filed with the
SDHR at the end of 2005 at the time of his termination. (Id., Ex.
A at 251).

The record reflects that at the time of plaintiff's April 2006
termination, his only recent complaint to the SDHR was the one
dated February 15, 2006. (Bloom Aff. 1, Ex. H at 3). The SDHR
dismissed this complaint for lack of jurisdiction on March 17,
2006. (Id., Ex. I). Despite plaintiff's mention during his

deposition of a SDHR complaint that he had filed at the end of 2005, we understand him to be referring to his February 15, 2006 SDHR complaint, as that complaint provides the foundation for his retaliation claim against the Museum in his April 10, 2006 SDHR complaint and this lawsuit. (See id., Ex. M at ¶ 1; Compl. at ¶ 9).[11]

## ANALYSIS

We first detail the standards by which we evaluate requests summary judgment, then address the requirements for establishing a Title VII retaliation claim, and finally apply those considerations to the current motion.

---

[11] The only claim against the Museum that plaintiff filed near the end of 2005 that would correspond chronologically to the one described by him during his deposition is the lawsuit that he filed in the New York Supreme Court, New York County on December 2, 2005. (Bloom Aff. 1, Ex. F). See p. 9, n.2, supra. The disposition of that state-court proceeding is unclear from the record. We need not address whether retaliatory animus towards plaintiff arose from his filing that lawsuit, however, as plaintiff's retaliation claim in this lawsuit is premised solely on his February 15, 2006 SDHR complaint. (See Compl. at ¶ 9). Moreover, when discussing his retaliation claim against the Museum, plaintiff has specifically referenced his complaint that he filed with the SDHR as opposed to his state-court lawsuit as the basis for his claim. (See, e.g., Bloom Aff. 3, Ex. A at 246).

27

I.    <u>Summary-Judgment Standards</u>

The court may enter summary judgment only if it concludes that there is no genuine dispute as to the material facts and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>see</u>, <u>e.g.</u>, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Feingold v. New York</u>, 366 F.3d 138, 148 (2d Cir. 2004). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Shade v. Hous. Auth. of the City of New Haven</u>, 251 F.3d 307, 314 (2d Cir. 2001) (quoting <u>Anderson v. Liberty Lobby, Inc.</u> 477 U.S. 242, 248 (1986)).  It is axiomatic that the responsibility of the court in deciding a summary-judgment motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." <u>Knight v. U.S. Fire Ins. Co.</u>, 804 F.2d 9, 11 (2d Cir. 1986); <u>see</u>, <u>e.g.</u>, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986); <u>Howley v. Town of Stratford</u>, 217 F.3d 141, 150-51 (2d Cir. 2000).

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the "pleadings, the discovery and disclosure materials on file, and any affidavits" that demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); see, e.g., Celotex, 477 U.S. at 323; Koch v. Town of Brattleboro, 287 F.3d 162, 165 (2d Cir. 2002). If the non-moving party has the burden of proof on a specific issue, the movant may satisfy its initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. See, e.g., Celotex, 477 U.S. at 322-23, 325; PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002); Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). If the movant fails to meet its initial burden, however, the motion will fail even if the opponent does not submit any evidentiary materials to establish a genuine factual issue for trial. See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 161 (1970); Giannullo v. City of New York, 322 F.3d 139, 140-41 (2d Cir. 2003).

If the moving party carries its initial burden, the opposing party must then shoulder the burden of demonstrating a genuine issue of material fact. See, e.g., Beard v. Banks, 126 S. Ct. 2572, 2578 (2006); Celotex, 477 U.S. at 323-24; Santos v. Murdock, 243

29

F.3d 681, 683 (2d Cir. 2001). In doing so, the opposing party cannot rest "merely on allegations or denials" of the factual assertions of the movant, Fed. R. Civ. P. 56(e); see, e.g., Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti, 374 F.3d 56, 59-60 (2d Cir. 2004), nor can he rely on his pleadings or on merely conclusory factual allegations. See, e.g., Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). He must also "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005). Rather, he must present specific evidence in support of his contention that there is a genuine dispute as to the material facts. See, e.g., Celotex, 477 U.S. at 324; Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994). In other words, he must demonstrate that there is sufficient evidence for a reasonable jury to find in his favor. Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc., 473 F.3d 450, 455-56 (2d Cir. 2007) (citing Anderson, 477 U.S. at 249).

We note that we must take special care to construe the parties' filings in plaintiff's favor when evaluating the existence of disputed material facts, in deference to his pro se status. See

Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988) (affording "special solicitude" to pro se litigants "confronted with motions for summary judgment"); Salahuddin v. Coughlin, 999 F. Supp. 526, 535 (S.D.N.Y. 1998) (noting that pro se litigants are to be given "special latitude on summary judgment motions") (internal quotation marks omitted) (quoting Reyes v. Kohler, 815 F. Supp. 109, 112 (S.D.N.Y. 1993)). This does not, however, "relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotation marks omitted). In particular, "a pro se party's bald assertion, completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." Lyerly v. Koenigsmann, 2006 WL 1997709, *2 (S.D.N.Y. July 17, 2006) (internal quotation marks omitted) (quoting Odom v. Jeane, 1997 WL 576088, *3 (S.D.N.Y. Sept. 17, 1997)).


II.  Requirements for Title VII Retaliation Claims


To establish a prima facie claim for retaliation, whether under Title VII, the First Amendment, or pursuant to New York state law, a plaintiff must demonstrate that he engaged in protected activity, that the defendant was aware of this activity, that he was subjected to an adverse employment action, and that the adverse

action occurred under circumstances suggesting a causal relation between it and the protected conduct. See Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 205-06 (2d Cir. 2006); Mandell v. Cnty. of Suffolk, 316 F.3d 368, 382 (2d Cir. 2003); Gordon v. New York City Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000); Calvello v. Elec. Data Sys., 2004 WL 941809, *6 (W.D.N.Y. Apr. 15, 2004). At the prima facie stage, a Title VII plaintiff must meet a burden of proof that has been described as "de minimis." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005).

If a plaintiff can present a minimal amount of evidence to support the elements of his Title VII retaliation claim, "a presumption of retaliation arises" and "the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." Id. (citing Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768-69 (2d Cir. 1998) (outlining three-step burden-shifting analysis for Title VII retaliation claims)). However, if the employer does proffer such a neutral reason for the adverse action, the plaintiff must "point to evidence sufficient to permit an inference that the employer's proffered non-retaliatory reason is pretextual and that retaliation was a 'substantial reason for the adverse employment action.'" Kaytor v. Elec. Boat Corp, 609

F.3d 537, 552-53 (2d Cir. 2010) (quoting <u>Jute</u>, 420 F.3d at 173).


III. <u>Evaluation of the Current Motion</u>


A.   <u>Plaintiff has Established a Prima Facie Case of Retaliation</u>


The first element of a <u>prima facie</u> retaliation claim requires the plaintiff to prove that he engaged in protected activity. Under Title VII, "protected activity" refers to actions —— formal or informal —— taken by the plaintiff to protest or oppose statutorily prohibited discrimination, or his making of charges, testifying, assisting or participating "in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3; <u>see also</u> <u>Sumner v. U.S. Postal Serv.</u>, 899 F.2d 203, 209 (2d Cir. 1990); <u>Wright v. Stern</u>, 450 F. Supp. 2d 335, 373 (S.D.N.Y. 2006).


Plaintiff clearly satisfies this requirement because prior to his April 5, 2006 discharge he filed a dual complaint with the SDHR and EEOC on February 15, 2006, alleging that he had overheard certain security guards' harassing comments about his medical condition as well as statements reflecting their desire to get him fired. (Bloom Aff. 1, Ex. H). Plaintiff's complaint to the SDHR

falls squarely within the definition of "protected activity" under Title VII. See, e.g., Flynn v. New York State Div. of Parole, 620 F. Supp. 2d 463, 489 (S.D.N.Y. 2009) (noting that filing SDHR complaint is activity protected by Title VII).

Plaintiff has also satisfied the second prong of a prima facie retaliation claim -- defendants' knowledge of the protected activity. In order to satisfy this knowledge requirement, a plaintiff need only show that the defendant had "general corporate knowledge" of his protected activity, not that the individual agents who carried out the alleged retaliation knew of his protected acts. Gordon v. New York City Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000). Accord Henry v. Wyeth Pharms., Inc., __ F.3d __, 2010 WL 3023807, *10-11 (2d Cir. Aug. 4, 2010); Kessler, 461 F.3d at 210.[12]

Based on defendant's submissions, it is clear that the

---

[12] However, to the extent that the decision-maker who carried out the adverse employment action was ignorant of plaintiff's protected activity at the time the action was taken, this fact is "admissible as some evidence of a lack of a causal connection" between plaintiff's protected activity and the adverse action. Gordon, 232 F.3d at 117. It can be used by a defendant to "counter[] plaintiff's circumstantial evidence of proximity or disparate treatment," to the extent that plaintiff relies on such evidence to establish the fourth element of his prima facie case. Id..

relevant department within the Museum received notice of the SDHR's dismissal of plaintiff's February 15, 2006 complaint for lack of jurisdiction on March 20, 2006, prior to plaintiff's termination. (See Bloom Aff. 1, Exs. H & I).[13] This notice alerted the Museum to the fact that plaintiff had engaged in the protected activity of filing an SDHR complaint. Therefore, plaintiff has satisfied the element of his prima facie case.

Under the third prong of a prima facie retaliation claim, a plaintiff must demonstrate that an adverse employment action was taken against him. The Supreme Court has stated that "the [Title VII anti-retaliation] provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant." Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006). The court explained that in bringing a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of

---

[13] We assume that the Museum also received a copy of plaintiff's February 2006 complaint from the SDHR soon after it had been filed to solicit a response from the Museum. (See, id., Ex. N). However, the record does not reflect the date on which the SDHR sent the Museum a copy of plaintiff's February 2006 complaint.

discrimination.'" <u>Id.</u> at 66 (quoting <u>Rochon v. Gonzales</u>, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (additional internal quotation marks omitted)). However, the Court rejected the limitation of actionable retaliatory conduct to "acts 'such as hiring, granting leave, discharging, promoting, and compensating'". <u>Id.</u> at 60 (quoting <u>Mattern v. Eastman Kodak Co.</u>, 104 F.3d 702, 707 (5th Cir. 1997) (additional internal quotation marks omitted)).

In this case, plaintiff stated that as a result of his discharge and reinstatement subject to a brief suspension in April 2006, he was deprived of ten days of straight-time pay plus three hours of overtime pay. (Bloom Aff. 2, Ex. A at 102). Defendant does not dispute that plaintiff was terminated in April 2006 and then reinstated, subject to a ten-day suspension without pay. (<u>See</u> Def.'s Summ. J. Mem. at 1-2). This suffices to demonstrate that plaintiff did suffer an adverse action that satisfies the third element of his <u>prima facie</u> retaliation claim. <u>See</u> <u>Burlington N. and Santa Fe Ry. Co.</u>, 548 U.S. at 72-73 (holding that thirty-seven day involuntary unpaid leave could constitute adverse employment action under Title VII, even though employee later received backpay).

Finally, plaintiff must show a sufficient causal connection between the protected activity and the adverse employment action.

36

This connection can be demonstrated through direct evidence of retaliatory animus directed against the plaintiff by the defendant. E.g., Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001). Indirect evidence can also suffice to establish this element of the retaliation claim: "Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action." Kaytor, 609 F.3d at 552 (citing, inter alia, Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)). However, "'[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close.'" Campbell v. Home Depot U.S.A., Inc., 2006 WL 839001, *13 (S.D.N.Y. Mar. 30, 2006) (quoting Clark Cnty. Sch. Dist., 532 U.S. at 273) (noting dispute within Circuit as to whether four-month gap is too long to establish temporal proximity). See also Holava-Brown v. Gen. Elec. Co., 189 F.3d 461, 1999 WL 642966, *3 (2d Cir. 1999) (noting that "[i]f the time that elapses between the protected activity and the adverse action is short enough, nothing more is necessary to satisfy the causation prong" and citing cases of lapses of ten days between filing of SDHR complaint and termination

and twelve days between complaint and dismissal).

The Second Circuit has not "drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated" to satisfy a plaintiff's prima facie causation burden. Gorman-Bakos v. Cornell Co-op Extension, 252 F.3d 545, 554 (2d Cir. 2001). However, as the period between the protected activity and allegedly retaliatory action increases, the probative value of the temporal proximity decreases and other factors -- such as evidence of the decision-makers' knowledge of the protected activity -- become more relevant to whether plaintiff has shown sufficient evidence of causation to satisfy his prima facie burden. See Gordon, 232 F.3d at 117 (noting that lack of evidence of decision-makers' knowledge of protected activity weighs against plaintiff's circumstantial proof of causation).[14] Accord Raqin v. E. Ramapo Cent. Sch. Dist., 2010 WL 1326779, *25 (S.D.N.Y. Mar. 31, 2010) (citing cases in which plaintiffs could not rely on circumstantial evidence of causation to satisfy prima facie burden because of lack of evidence that those involved in adverse action knew of protected activity). See also Clark Cnty. Sch. Dist., 532 U.S. at 273-74

---

[14] Evidence that a person with knowledge of plaintiff's protected activity encouraged another person who was ignorant of that activity to take an adverse action against the plaintiff is ultimately enough to establish the requisite causal connection. Henry, 2010 WL 3023807, at *11.

38

(affirming district court's award of summary judgment to defendant on Title VII retaliation claim where adverse action was taken twenty months after protected activity and there was no evidence that person responsible for adverse action knew of protected activity).

Here, plaintiff filed a dual SDHR and EEOC complaint on February 15, 2006 and his employment was terminated on April 5, 2006. (Bloom Aff. 1, Ex. H; Bloom Aff. 3, Ex. C). He was subsequently rehired on April 11, 2006, subject to a ten-day unpaid suspension. (Bloom Aff. 3, Ex. E). This sequence of events establishes temporal proximity between plaintiff's protected activity and the Museum's adverse employment actions. Harrison v. N. Shore Univ. Hosp., 2008 WL 656674, *12 (E.D.N.Y. Mar. 6, 2008) ("[C]ase law indicates that a gap of up to one to two months between the protected activity and the adverse action may establish the requisite causal connection" for a Title VII retaliation claim).

Moreover, the record is somewhat unclear about whether the Museum officials who played a role in plaintiff's termination and suspension were aware of his protected activity, but we do not view this uncertainty as undermining plaintiff's prima facie showing of

causation based on temporal proximity. Indeed, plaintiff suspected that his supervisor Jose Rivero made the decision to fire him, and he alleged that he later overheard Rivero claiming responsibility for the decision. However, plaintiff conceded during his deposition that Rivero may not have known that he had filed a complaint with SDHR. (Bloom Aff. 3, Ex. A at 246, 251). Likewise, union representative Ron Boyer and Assistant Security Manager John Packert were present during the meeting at which plaintiff was fired, and Packert has claimed responsibility for the decision to dismiss plaintiff. (Id., Ex. C; Packert Decl. at ¶ 2). However, there is no evidence in the record to demonstrate that either Boyer or Packert were aware of plaintiff's February 2006 SDHR complaint. (See Packert Decl. at ¶ 2).

Nevertheless, the Museum has not specified which of its employees were aware of plaintiff's protected activity, and has not explicitly represented that none of its employees with knowledge of plaintiff's SDHR complaint were involved in the decision to terminate or suspend him. Given the posture of the current motion, we must draw all inferences in plaintiff's favor, and therefore do not view the open question as to the knowledge of plaintiff's protected activity on the part of the Museum officials involved in his termination and suspension to outweigh plaintiff's

40

circumstantial showing of causation, at least for the limited purpose of evaluating whether he has satisfied his <u>prima facie</u> burden.

In sum, plaintiff has met his burden of establishing the required elements of a <u>prima facie</u> retaliation claim.

B.  <u>Defendant has Proffered a Non-Discriminatory Motive</u>
    <u>for its Actions</u>

Since plaintiff has met the minimal standard for showing a <u>prima facie</u> case of retaliation, the burden shifts to defendant to proffer a non-discriminatory reason for plaintiff's termination and subsequent ten-day suspension. The Museum asserts that on April 5, 2006, plaintiff abandoned his post and that this violation of his responsibilities as a security guard, as well as his past disciplinary problems, provide a non-discriminatory ground for his termination and subsequent re-hiring subject to a suspension. (Def.'s Summ. J. Mem. at 7). Defendant has adduced specific evidence to support its contention that there was a legitimate non-discriminatory ground for plaintiff's termination. First, during his deposition, plaintiff admitted that he had abandoned his post on April 5, 2006 without permission from his supervisor or the Command Center, in violation of the Museum's security regulations.

(Bloom Aff. 3, Ex. A at 38, 79, 85). Second, the Museum has proffered testimony from the official who fired plaintiff indicating that his dismissal was occasioned by his unapproved departure from his post in the Linsky Galleries on April 5, 2006 to visit the Human Resources office and that the Museum fired plaintiff as a result of this violation and his disciplinary history. (Packert Decl. at ¶ 2). Defendant has thus articulated a non-discriminatory reason for plaintiff's termination and subsequent re-hiring subject to a ten-day suspension. See Moncrief v. New York Pub. Library, 343 F. App'x 627, 629 (2d Cir. 2009) (noting that plaintiff's security breach constituted non-discriminatory basis for dismissal); Cruz v. Coach Stores, Inc., 202 F.3d 560, 567-68 (2d Cir. 2000) (considering defendant to have articulated a non-discriminatory basis for plaintiff's termination by pointing to plaintiff's violation of company policy).

C. Plaintiff Has Not Shown that Defendant was Motivated by a Retaliatory Purpose

Since the Museum has demonstrated that it had a non-discriminatory reason for suspending plaintiff, the burden shifts back to plaintiff to show that the Museum's proffered non-discriminatory rationale is pretextual or that retaliation was a "substantial reason for the adverse employment action." Jute, 420

42

F.3d at 173. Although plaintiff need not demonstrate that his suspension was caused solely by defendant's retaliatory animus, he must show that such retaliation was a "substantial" or "motivating" factor in the Museum's decision. Raniola, 243 F.3d at 625; Fields v. New York State Office of Mental Retardation & Developmental Disabilities, 115 F.3d 116, 120-21 (2d Cir. 1997) (explaining that an impermissible reason need not be the sole motivation for an adverse employment action to sustain a Title VII claim).

Plaintiff has failed to demonstrate the existence of a triable dispute on this score. He has not adduced any admissible evidence in his opposition filings to controvert the Museum's explanation of the sequence of events that culminated in his ten-day suspension or to show that the Museum acted based on a retaliatory motive.

During his deposition, plaintiff offered a retaliatory rationale for his termination that could have created a triable dispute as to the Museum's motivation, had it been supported by any evidence in the record. Specifically, he claimed that Museum security manager Rivero made the decision to fire him in order to gain leverage against him in connection with the Museum's answer to his SDHR complaint. (Bloom Aff. 3, Ex. A at 246). However, plaintiff offers no basis for inferring that Rivero knew about

43

plaintiff's February 15, 2006 SDHR complaint at the time that he was fired. (See id., Ex. A at 251). Moreover, he offers no competent evidence -- as distinguished from rank speculation -- either (1) that Rivero made the decision to fire him or (2) that if he did, he acted from a retaliatory motive. Indeed, apart from its speculative nature, plaintiff's expressed suspicion about the motive lacks plausibility. The SDHR had dismissed plaintiff's complaint for lack of jurisdiction nearly a month prior to his termination, rendering his claim that he was dismissed to enhance the Museum's leverage in that proceeding implausible. (See Bloom Aff. 1, Ex. I). Moreover, plaintiff fails to explain how terminating his employment would have assisted the Museum in responding to his allegations in his SDHR complaint, even if that complaint had still been pending. (Bloom Aff. 3, Ex. A at 251).

In short, plaintiff has failed to submit any competent evidence to refute defendant's explanation of the circumstances surrounding his termination and subsequent re-hiring. Apart from his own assumptions and speculation, plaintiff has proffered only an incomprehensible audio cassette and personal e-mails that he wrote to defense counsel, none of which suffice to create a triable dispute as to the Museum's motivation in terminating his employment or suspending him briefly without pay. Since the Museum's non-

44

discriminatory reasons for plaintiff's termination and subsequent suspension stand undisputed, we recommend that summary judgment be granted in its favor on plaintiff's claim for retaliation.

## CONCLUSION

For the reasons stated, we recommend that defendant's motion be granted and that plaintiff's remaining claim against it, for retaliation under Title VII, be dismissed.

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. See also Fed. R. Civ. P. 6(a), 6(d). Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Jed S. Rakoff, Room 1340, and to the undersigned's chambers, Room 1670, U.S. Courthouse, 500 Pearl Street, New York, NY 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Thomas v. Arn, 474 U.S. 140, 150-55 (1985), reh'g denied, 474 U.S. 1111 (1986).

45

**DATED:**  **New York, New York**
           **August 17, 2010**


                                    **MICHAEL H. DOLINGER**
                                    **UNITED STATES MAGISTRATE JUDGE**


Copies of the foregoing Report and Recommendation have been
mailed this date to:

Mr. Richard Massie
120 Aldrich Street
Apt. 12H
Bronx, New York 10475

Allan S. Bloom, Esq.
Emily J. Ratté, Esq.
Paul, Hastings, Janofsky & Walker LLP
75 East 55th Street
New York, New York 10022